[Civ. No. 8853. First Appellate District, Division Two.—May 4, 1933.]

HERCULES POWDER COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and CHARLES H. NEYMAN, Respondents.

Pillsbury, Madison & Sutro, Eugene M. Prince and Francis Gill for Petitioner.

A. I. Townsend for Respondents.

STURTEVANT, J.—The petitioner, as employer and its own insurance carrier, has applied for a writ of review to have annulled an award made by the Industrial Accident Commission in· favor of Charles H. Neyman. In its points and authorities it claims that the respondent Commission exceeded its powers in making several different findings.

The facts out of which the controversy arose are comparatively brief. The claimant, Charles H. Neyman, is by occupation an electrical engineer. Within a few years prior to October 10, 1931, he applied to the Pacific Gas and Electric Company for employment. Before employing him he was required to undergo a medical examination. A little later

he applied to the Ford Motor Company for employment. It also required him to undergo a physical examination. Still later he accepted employment with the Hercules Powder Company. He had been in their employ about a year. On October 10, 1931, while operating an electric drill, some of the dust made by the drill while he was boring was blown into both eyes. The petitioner took him to the Richmond Hospital, where Dr. Hedges instilled four per cent cocaine in both eyes to enable him to remove the dust particles. On the next day, upon Neyman's complaint that his right eye was still bothering him, he was taken by the petitioner to Dr. Stephens. The latter made a thorough examination and prescribed a treatment. At the time that Dr. Hedges treated the patient, the patient was suffering great pain. After the treatment was finished and all dust particles removed the eyes were irrigated and then the right eye was bandaged and the patient was directed to allow the bandage to remain for a day. When Neyman was examined by Dr. Stephens the latter removed the bandage. At that time he found the inflammation had passed away and the eyes were so clear that he was able to and did make a full and complete examination, the result of which disclosed that Neyman was suffering from chronic glaucoma of at least a year's standing which was far advanced in both eyes. About the 1st of November Neyman consulted Dr. Benjamin Thomas of Oakland. Upon making an examination Dr. Thomas reached the same conclusions regarding the presence of glaucoma and the long standing thereof. From the time that Neyman went to Richmond Hospital and continuously thereafter all vision of the right eye was entirely gone. The left eye was inflamed immediately after the dust particles got into it, but responded to treatment by Dr. Hedges. The record discloses nothing to the contrary until December 11, 1931. About that date Dr. Thomas made further examinations and as stated in his letter on that date "Mr. Neyman has a very grave prognosis in regard to the vision in his left eye also." Our attention has not been called to any other passage in the record regarding the condition of the left eye subsequent to the date last mentioned.

The respondent Commission, after a prolonged hearing, made findings of fact which, among other things, included the following:

"Findings of Fact.

"1. . . . While drilling with an electric drill, said applicant got steel in both eyes, and thereafter was furnished medical treatment for such condition, and the injury and treatment used in the removal of steel from the eyes of the applicant caused an acute exacerbation of a quiescent glaucoma condition in both eyes. At said time the said employer was self-insured, under and by virtue of permission and authority from the Industrial Accident Commission of the State of California, and both employer and employee were subject to the provisions of the Workmen's Compensation, Insurance and Safety Act of 1917.

"2. Said applicant was a driller, 42 years of age, and said injury caused permanent disability consisting of loss of sight of both eyes. The percentage of said permanent disability is 100 per cent. . . . ''

The petitioner makes many attacks, but in the view we take of the record it will not be necessary to notice all of them. The petitioner says there was no evidence that the glaucoma was quiescent. The respondents reply that it is immaterial because, as they contend, the petitioner is liable whether the glaucoma was quiescent or was not. Continuing, the petitioner claims that the only competent evidence was to the effect that the treatment by Dr. Hedges did not cause an acute exacerbation of the chronic glaucoma and that the opinion to the contrary given by Dr. Thomas was not based on a complete history of the case. That contention has much to support it. But if the point be conceded the contention does not terminate this proceeding. The uncontradicted evidence was that Neyman was suffering from glaucoma in both eyes before the accident. It was the opinion of Dr. Thomas that when Dr. Hedges instilled four per cent cocaine, a mydriatic, the drug caused an acute exacerbation of the chronic glaucoma because the history of the case showed no inflammation when Dr. Stephens made his examination and for other reasons not necessary to repeat several experts expressed an opinion contrary to that of Dr. Thomas. However, the conflict was more apparent than real. No witness expressed the opinion that the glaucoma was caused by the accident. All admitted its presence, its decided development, and all were of the opinion that it was of at least a year's standing. Dr. Thomas was of the opinion

that when Dr. Hedges instilled cocaine into Neyman's eyes he thereby caused an acute exacerbation of the existing glaucoma which produced blindness in the right eye. The other experts testified that while such treatment might in some cases produce that result, nevertheless under the history of this case they were of the opinion that it did not do so. However, those same witnesses were in agreement that as chronic glaucoma progresses the fibers of the optic nerve are atrophied one by one; and that when it has nearly run its course and when only a few unatrophied fibers remain the disease may be culminated and a complete loss of vision may be caused by many different causes. The respondent Commission named a board of three able specialists to make an examination and report its findings to the commission. The board consisted of Doctors Pischel, Glaser and Cordes. It reported as follows: " . . . That if the sight of the right eye was good before the injury, the blindness of that eye may have been precipitated by a combination of causes—irritation and pain, caused by the injury and by the efforts to remove the foreign bodies at the shop, associated with worry and excitement. The cocaine and other mydriatics may have been an additional factor. In other words, the loss of vision of the right eye may have been the result of the above factors superimposed upon an eye that had been already tremendously damaged by the preexisting glaucoma. That the present loss of vision in the left eye is in no way related to the injury." That statement, it will be noticed, is predicated on the assumption that the sight of the right eye was good before the injury. However, if it was not it would seem that the result mentioned would be all the more certain. Dr. Alexander, at the request of the petitioner, made an extended examination and filed a written report. Speaking from his own experience and reading in part from standard authorities, he said: "The final step in complete blindness in chronic simple glaucoma, and the method in this noninflammatory case, is that one or more of many causes of rise of intro-ocular tension acted on an optic nerve which had just a few unatrophied fibers left. Namely, those going to the macula region and giving the central vision so that the patient might even get 20/20 vision. The increased pressure necessary for this step would only have to be moderate, causing atrophy of the last remnant of the nerve. Long

lists of such cases are mentioned in all text books. Fuchs says on page 468 'Often specific causes for these attacks can be demonstrated such as hearty meals, late hours, emotional excitement, etc. In many cases they return without cause, that is without obvious or probable cause' . . . Finally the whole picture could be caused by any one of a thousand and one coincident and extraneous factors as the final non-inflammatory step of loss of vision in the admitted chronic glaucoma.'' On the theory just stated there was no conflict in the evidence. In other words, the uncontroverted evidence was to the effect that before the day of the accident Charles Neyman was afflicted with chronic glaucoma in both eyes. When, shortly after the accident, Dr. Hedges inserted in the eyes mydriatics the effect of the treatment might have produced acute glaucoma. Be that as it may, the evidence was distinctly conflicting on that issue. However, chronic glaucoma so operates that the fibers of the optic nerve, one after the other, are atrophied. As the disease progresses vision is narrowed. If at the time of the accident only a few fibers were left undamaged the effect of getting quantities of metal dust in the eyes, rubbing them, having the dust extracted, worrying over the condition, etc., might result in a noninflammatory condition which would atrophy the remaining undamaged fibers and thus cause a total blindness in one eye or both. Considering all of the symptoms disclosed by the history of the case, as we understand their testimony the medical experts testified that Neyman's case fell within the class last stated. If the respondent Commission so interpreted the evidence it was entitled to infer that the presence of the metal dust in Neyman's eyes caused such a "general condition, nervous and otherwise, which modified the blood circulation in the eye . . . " producing "the final non-inflammatory step of loss of vision in the admitted chronic glaucoma". Freely admitting that other inferences might be drawn to the contrary, nevertheless on this hearing every inference in support of the judgment must be indulged. (*Mah See* v. *North American Acc. Ins. Co.*, 190 Cal. 421, 426 [213 Pac. 42, 26 A. L. R. 123].) Therefore we are of the opinion that it cannot be said that finding number one is not sufficiently supported as to the loss of the sight of the right eye.

■ As to the left eye the record is quite different. The evidence is positive, on the side of the petitioner, that it was not affected by the accident. On the side of the claimant Dr. Thomas said it was affected—whether temporarily or permanently he did not say. No witness testified that the claimant had entirely lost his sight in that eye. Nevertheless the respondent Commission made a finding to the effect that the claimant had lost his sight in both eyes. In so far as that finding extends to the left eye it was not supported by the evidence.

■ The petitioner complains because the respondent Commission did not apportion the injury and determine what portion of the disability was caused by the accident. (Sec. 3, subd. 4, 2 Deering's Gen. Laws, p. 2276.) The Commission has made no reply. We think the contention is well founded. The burden rested on the claimant to prove his case in all its parts. When he had finished making his proof it will be conceded that he was entitled to relief to the extent of the injury suffered as to each eye. However, as he had not lost the sight of both eyes he was not entitled to rely on section 9 (b) (2) (9), Id. ■ Furthermore, as the evidence showed that he was afflicted with chronic glaucoma in both eyes immediately before the accident, he was not entitled to claim that the industry should be charged with the full damage done to the optic nerve. He was bound to introduce such evidence that the respondent Commission could separate the damage done by the accident from the damage done by the chronic glaucoma and apportion its award accordingly. (*Edson* v. *Industrial Acc. Com.*, 206 Cal. 134, 139 [273 Pac. 572].)

From what has been said it follows that the award under review was and is unsupported by the undisputed facts. The award is therefore annulled and the cause remanded to the respondent Commission for further proceedings not inconsistent with the views herein expressed.

Nourse, P. J., and Spence, J., concurred.